## Hays *et al. versus* Quay.

| 68 | 263 |
|---|---|
| 176 | 11 |

1. "Whereas I have purchased from Richards 100 acres which was intended for my sister Elizabeth, therefore I do acknowledge the receipt of $100 from my father to be paid to Richards on account of said land." This created no trust for Elizabeth.

2. Neither the intention of the brother when he bought the land, nor the receipt of money from his father for the purchase, raised a trust.

3. The brother made a declaration of trust that his father had given him $300 to lay out in land from Richards for the use of Elizabeth, and promised in it to convey 50 acres, describing them, for her separate use; there was proof that he did not claim any of the land till after his father's death, with other evidence to show a trust in the whole. It was competent for the brother to rebut the presumption of a trust in the whole by his own testimony that the receipt was a mistake in stating that *all* the land was for his sister, and by other testimony of an understanding in the family that but 50 acres was to be in trust.

4. The land was purchased at $6 per acre, the presumption was that the trust was for so much as the money, $300, advanced by the father would pay for, and the burthen was on the sister to prove that it was more than 50 acres.

5. The character and extent of the trust was to be ascertained by the jury, not only from the writings but from all the evidence written and parol.

March 28th 1870.    Before THOMPSON, C. J., READ, AGNEW and SHARSWOOD, JJ.    WILLIAMS, J., at Nisi Prius.

Error to the Court of Common Pleas of *Clinton county :* No. 66, to January Term 1871.

This was an action of ejectment, commenced April 28th 1857, by Sarah Hayes and others against Joseph F. Quay, for a tract of about 50 acres of land.

The legal title of the land was in the defendant ; the plaintiffs claimed as heirs of their mother, Elizabeth Hays, a sister of the defendant, and they alleged that he had purchased it with money advanced by his father, Robert Quay, to be held in trust for Mrs. Hays.

On the 17th of February 1834, William Richards by articles agreed to sell to the defendant a tract of land · of which that in controversy was a part, describing it somewhat minutely by adjoiners and courses, supposed to contain 110 acres, for which the defendant was to pay $6 per acre, $300 to be paid May 15th 1835, and the remainder May 15th 1837.

The defendant afterwards delivered the following paper to his father :—

"Whereas, I have purchased from William Richards about one hundred acres of land, which was intended for my sister Elizabeth Hays, therefore I do this day acknowledge the receipt of one hundred dollars from my father, Robert Quay, to be paid to said Richards, on account of said land.    Witness my hand, June 8th 1835.                                   "Jos. F. QUAY."

On the 20th of December 1844, Richards, for the consideration of $750, conveyed the land to the defendant, describing it in the deed by metes and bounds, and stating that the tract contained 125 acres.    After this conveyance the defendant executed the following declaration of trust :—

"Whereas, Robert Quay, in his lifetime, placed in my hands obligations against Samuel Graham for $300, and directed me to lay out the same in the purchase of land from William Richards, for the use of my sister, Elizabeth Hays, and I having purchased from said Richards 125 acres joining the Thomas Burck survey, it is my intention that the 50 acres shall be stricken off joining the Burck line, as follows : Beginning at a post-corner of the Alice Monroe survey (describing the 50 acres by metes and bounds), and to contain 50 acres, neat measure, and which lot or piece of land I promise to convey, by a regular deed of conveyance, to

[Hays *v.* Quay.]

Thomas Brown, of Lamar township, Clinton county, in trust for the sole use and benefit of the said Elizabeth Hays, her heirs and assigns for ever; and should anything occur to prevent me from executing said deed of conveyance before the 1st of June next, I do hereby authorize and fully empower my executors or administrators to execute the same agreeable to the above courses and distances: Provided always, That before any such release is executed the said Elizabeth, her heirs or assigns, shall and do produce from John S. Furst a full discharge from being in any manner liable to pay him $150, for which amount I signed written obligations jointly with said Elizabeth, in the summer of 1844, that being the only obstacle to the immediate execution of said release.

"Witness my hand and seal, this 4th day of January, A. D. 1845."

The defendant afterwards made another deed as follows:—

" This indenture, made the seventeenth day of December, A. D. eighteen hundred and fifty-three, between Joseph F. Quay, &c., of the first part, and Joseph F. Q. Hays, &c., of the other part, whereas my father, Robert Quay, did in his lifetime put into the hands of the said Joseph F. Quay the sum of $300, for the purpose of purchasing from and paying William Richards for 50 acres of land for the sole use and benefit of Elizabeth Hays, a daughter of the said Robert and Sarah his wife, and the said Joseph did accordingly purchase the land as aforesaid for the use of his sister the said Elizabeth, and at the same time he also purchased for his own use an adjoining lot of land from said Richards, and in making the title from said Richards to the said Joseph the whole of the purchase was included within the deed, and afterwards the said 50 acres of land were surveyed off for said Elizabeth, but she having died before any deed or release was executed to her for said land, therefore the same descended to her lawful heirs, to wit, &c., and it being agreed upon by and between the heirs aforesaid that the title shall be made to Joseph F. Q. Hays aforesaid in trust for the use of his brothers and sisters, therefore this indenture witnesseth that the said Joseph F. Quay, for and in consideration of one dollar, &c., * * * has granted, &c., unto the said Joseph F. Q. Hays, in trust for the sole use, benefit and behoof of his brothers and sisters within named, all that certain lot or piece of land, &c., * * * containing 52 acres and 100 perches, neat, and which is a part of a tract of land which William Richards by deed dated December 20th, A. D. 1844, &c., granted and confirmed to said Joseph F. Quay," &c. * * *

The cause was tried May 19th 1869, before Elwell, P. J., of the Twenty-sixth District, when the foregoing instruments were given in evidence.  The plaintiffs called their father, Gilbert Hays, the husband of Elizabeth Hays, who testified that he took possession of the 100 acres, and occupied the tract till the death

[Hays *v.* Quay.]

of Robert Quay the father, in 1836, without claim by the defendant till then; cut logs on the part (10 or 12 acres), which the defendant afterwards took; subsequently a line was run between the two parcels, leaving the 10 or 12 acres on defendant's side; the line was marked in 1847, and both parties have farmed up to that line since.

H. Snyder testified that the defendant said the 100 acres were for his sister, and he had to give his sister $600, or half of it; witness cleared 10 acres of land on it for Hays. There was also evidence that the defendant had acknowledged that the land had been bought for the sole use of his sister and her heirs.

There was other evidence by plaintiffs to sustain their case.

The defendant read the testimony of John Quay, a son of Robert Quay, taken upon commission. Amongst other things he said—

"I don't recollect being present at any agreement touching the land in question, but I heard much family conversation about the purchase from my father, brother Joseph, sister Elizabeth Hays, and her husband Gilbert Hays, and from those conversations I always understood that my sister Elizabeth was to have 50 acres only of the purchase from Richards, which was to adjoin the place she lived on; and as to paying for the 50 acres, Robert Quay had an agreement with Samuel Grimes, Jr., to sell him a claim to some land up the river for $300, which was to be applied to paying for the 50 acres for Elizabeth Hayes. From the time of the purchase of the lands from Richards up to the death of Robert Quay, he had not any means to apply to the payment of the 50 acres of land except the money from Grimes, for he had very little money in hand, and no means of making any."

This part of the deposition was objected to by the plaintiffs, admitted by the court and bills of exception sealed.

The defendant testified that after some wrangling with his father about the sum for which the receipt of June 5th 1835 was given, father "went and got the $100 and threw it down on the table and said, 'now give me a receipt;' I took up a piece of paper and wrote that receipt of 8th June 1835, which has been exhibited here; being agitated and angry I wrote one hundred acres instead of fifty, as I intended to do; we were both angry; this was more than a year after I bought the land; right away after buying I went on and took possession of the northern part of the 100 acres, and told Hays to go to work on the southern part next to where he lived; we worked on in that way; the land that Hays had was harder to clear, and he worked on that; it went on so for two years, till I put Snyder on; I leased to Snyder 50 acres for eight or ten years on an improving lease; he was on from spring of 1838 to spring of 1849; after Snyder had been on a year or two, either one, or both, suggested there ought to be a line or bound-

[Hays *v.* Quay.]

ary to clear to; Hays cleared to that line and over, and Snyder cleared a good deal on Hays's part; went on in that way till 1847; in 1847 laid off Hays's part, 53 acres· and some perches; Hays was along when we laid it off; no kind of objection was made; Hays carried chain or blazed the line; we run round the whole 50 acres; Henry Snyder carried one end of the chain; I made one half of the division fence and Hays the other, and we farmed on until 1857; did not know of any difficulty at all till the sheriff came with the ejectment; the line of 1847 was the one Platt found; we found the line established for clearing to was 10 or 12 rods down, and Hays had cleared to it; Hays said, 'here is land that I cleared and I have not got three crops off from it;' and I did not care and he done so; he had had one crop; after he abandoned it I went and moved the fence on to the line; in January 1845, I was about going to Harrisburg; my sister came to my house early in the morning and said, 'you are going to Harrisburg and I have nothing to show for that 50 acres of land;' she wanted something under my hand to show that she should get the land, and I sat down and wrote that paper (paper dated 4th January 1845), and gave it to her; that paper stipulated about the debt to Mr. Furst. In 1853 Abraham Best was pressing Hays for a debt, and he levied on the whole 100 acres; Joseph Hays said Best was going to sell them out, and he wanted me to make deed of the 50 acres, and he said the rest were willing he should take the deed in trust; I made the deed, but would not make it till I had been released from the obligation I had signed with my sister Elizabeth to Mr. Furst." * * *

John S. Furst testified: "I had a paper from Judge Quay, sent from Harrisburg; when he came home we went to see his sister Elizabeth; it was there stated what the judge had done in giving security to me for her benefit; she was sick in bed; he wrote on that paper or another, in which she approved his doing it; think she signed the paper, at least she approved it. In the first place, Judge Quay wrote me that he had the title to 50 acres; that he could make the title to his sister or not if he chose, but that he would not convey to her or any one else, if I would advance $150 for the benefit of Mrs. Hays's family, until I was secured; this was the letter from Harrisburg; when we went out to her house he wrote, as stated, on that letter, or another paper, and she approved or signed it; she was informed what was written."

The plaintiffs' points were:—

1. "The article of agreement between William Richards and the defendant, dated February 17th 1834, and the receipt or acknowledgment of defendant, dated June 8th 1835, stating that the land bought by him from William Richards was intended for his sister Elizabeth Hays, and that he received $100 from his father to pay on account of the land, are together a valid

declaration of trust in writing unaffected by the Statute of Frauds; and if the receipt was made without mistake, the subsequent deed from William Richards to the defendant, dated 20th December 1844, vested the legal title to the land in dispute in the defendant in trust for Elizabeth Hays, the mother of the plaintiffs."

2. "In this action the testimony of Joseph F. Quay that 'one hundred' acres was written in his acknowledgment of the 8th of June 1835, by mistake, instead of 'fifty' acres, is, alone, insufficient to prove that any mistake was made."

The court charged: * * *

"We also refer you to the testimony of Mr. Furst as to the writing in regard to the land, as 50 acres given to him by defendant, with the approbation of Mrs. Hays; and also the evidence in regard to the possession, occupying and improvement of portions of the land purchased of Richards, separately, by the parties. It is contended by the counsel of the plaintiffs that the purchase of Richards by defendants in 1834, with the receipt of 1835, constitute a valid declaration of trust for the whole 125 acres contained in the Richards deed, and that the legal title was held by defendant in trust for Mrs. Hays, their mother, while she lived, and since her death, for the plaintiffs, her heirs. On the part of the defendant it is denied that such is the legal effect of these instruments. It is alleged that the word one hundred acres was inserted in the receipt by mistake, instead of fifty acres; it is alleged that defendant received for Mrs. Hays but $300, the price of 50 acres, and that in her lifetime the whole matter was settled and the 50 acres set aside to Mrs. Hays, and taken possession of by her. [In my opinion, the rights of the parties do not depend wholly upon the articles of agreement with William Richards and the receipt of the defendant to his father. The real character and extent of the trust is to be ascertained from those writings in connection with the declaration of trust produced here by the plaintiffs, dated January 4th 1845, the writing before mentioned, testified to by Mr. Furst, the admissions of the parties, their separate possession of parts of the land, the alleged division lines run between them, and all facts tending to show the amount of money belonging to Mr. Hays and inserted in the purchase of the land.] [Mrs. Hays was entitled to no more land than her money would purchase at the price agreed upon; her equitable right or title to or in the land was proportioned to the amount of money furnished by or for her to the defendant, with which to make the purchase. The defendant was not bound to advance $450, with interest upon it till paid, for the benefit of his sister; but he was bound in equity to give her an equivalent in land for the Graham debt, or other money received from her father or from her to be invested in land.] Having acknowledged in writing that the land which he had purchased was intended for his sister, he was bound to carry

[Hays *v.* Quay.]

out the arrangement in good faith; but he was not bound, either legally or equitably, to advance money for her benefit beyond the assets placed in his hands. [If the arrangement was that the Graham debt of $300, due to old Mr. Quay, should be invested by the defendant in land for Mrs. Hays at the price paid Richards per acre, and the number of acres was by mistake inserted in the receipt of defendant as one hundred, when it should have been fifty; if the sum of $300 was all the money invested for her in the purchase, and if she received the stipulated number of acres, and with her husband occupied the same till her death, and her heirs have continued in possession until this time, the plaintiffs have no title nor equitable interest in the residue of the land purchased of Richards.] [In determining the question whether there was or not a mistake in the receipt, you will not be governed alone by the testimony of the defendants, but you will consider all the evidence in the case bearing upon that point—the receipt itself, the other writings before referred to, the acts and admissions of the parties, and every other fact which may tend to corroborate or impeach the direct evidence of mistake, will be remembered and carefully considered by the jury.] [The acceptance of the deed of 1853 by Joseph F. Q. Hays, one of the plaintiffs, for the 50 acres (set apart to Mrs. Hays) in trust for himself and the other plaintiffs, is not conclusive upon the subject of the extent of trust. It is, however, evidence against the party accepting the deed, and all the other heirs of Mrs. Hays who were at the time of age, and who had knowledge of and assented to the lines made.] In conclusion we submit the case as follows: [If the jury believe there was no mistake in the receipt of the defendant, then Elizabeth Hays had an equitable interest in the land equivalent to the money furnished by her or her father to the defendant to be invested in it. The burden of proof is upon the plaintiffs to satisfy the jury as to the amount. The plaintiff set up an equitable title against the legal title of the defendants; it is, therefore, incumbent upon them to establish the facts which create that equity and fix its value.] If such equivalent has not been already received in the land in possession of plaintiffs, they are entitled to receive such proportions of the residue of the Richards purchase as, at the price paid, will give to them their full share of the land. If, however, the jury believe that the receipt was by mistake made to read one hundred acres instead of fifty, and that the latter quantity was fairly set off to Mrs. Hays, she furnishing but $300 of the purchase-money to Richards, their verdict should be for the defendant. [If the parties, with a full knowledge of their rights, settled and adjusted this matter between themselves, and land was set apart to Mrs. Hays as her share of the Richards purchase, although she was a married woman at the time, she would be bound by such adjustment, and her heirs cannot annul her agree-

[Hays *v.* Quay.]

ment.]    Several points have been presented by the counsel for the plaintiffs, but as they are fully answered in the charge just given, we will not repeat the answer to each point separately."

The verdict was for the defendant.

The plaintiffs removed the record to the Supreme Court by writ of error, and assigned for error :—

1, 2. Not affirming plaintiffs' points.

3–9. The parts of the charge in brackets.

10–12. Admitting the testimony of John Quay contained in the bills of exception.

*S. R. Peale* and *J. W. Comly*, for plaintiffs in error.—The Statute of Frauds does not require that a trust shall be *created* by writing, but it shall be *proved* by writing, which may be subsequent to its commencement: Forster *v.* Hale, 3 Ves. 696, also note a; 4 Kent's Com. 343. The testimony of the defendant alone is not made by the Act of 1869 equivalent to the chancery proof; this must be two witnesses: Gressly's Eq. Ev. 4. Equity will not reform an instrument on the ground of mistake unless the evidence of the mistake is satisfactory and clear, precise and indubitable: Irwin *v.* Shoemaker, 8 W. & S. 75; Rearich *v.* Swinehart, 1 Jones 233; Moser *v.* Libenguth, 2 Rawle 428; 1 Story's Eq. §§ 152, 153; Gressly's Eq. Ev. 205. The nature of the trust can be ascertained only by the papers, and cannot be changed by the admissions or declarations of either trustee or cestui que trust, or by their acts: Hamilton *v.* Neel, 7 Watts 517; Edwards *v.* Edwards, 3 Wright 369. A trustee cannot so act in relation to the trust as to make any benefit for himself against the cestui que trust: Note to Keech *v.* Sandford, and the authorities referred to, 1 Lead. Cas. Eq. 91. If the proof was insufficient the court should have withdrawn the question of mistake from the jury: Stine *v.* Sherk, 1 W. & S. 195; Miller *v.* Smith, 9 Casey 386. Under the circumstances equity would have set aside the arrangement with Furst: Schoch's Appeal, 9 Casey 351; Delameter's Estate, 1 Whart. 375.

*S. Linn*, for defendant in error.—The plaintiffs' rights would be in proportion to the amount of money received from Robert Quay: Kissler *v.* Kissler, 2 Watts 324; Peebles *v.* Reading, 8 S. & R. 484; Halsey *v.* Tate, 2 P. F. Smith 314; Bottsford *v.* Burr, 2 Johns. Ch. R. 405; 4 Kent's Com. 306; Gillespie *v.* Moon, 2 Johns. Ch. R. 585. The division line having been defined in the instrument of January 4th 1845, having been run and marked upon the ground in 1847, and ever after acquiesced in by the parties by building thereon a line fence, and clearing up to it on either side, Mrs. Hays, although a married woman, would be bound by it: Brown *v.* Caldwell, 10 S. & R.

114; Beeson v. Beeson, 9 Barr 299; McMahan v. McMahan, 1 Harris 380; Williard v. Williard, 6 P. F. Smith 119.

The opinion of the court was delivered, May 8th 1871, by

SHARSWOOD, J.—It will be entirely unnecessary to examine separately the twelve assignments of error. They all depend upon a single proposition. The corner-stone of the case of the plaintiffs is the assumption that the receipt or acknowledgment of the defendant, dated June 8th 1835, was a valid declaration of trust in writing for the land described in the agreement of February 17th 1834 between him and William Richards. If this corner-stone crumbles, with it falls the whole superstructure built upon it. This receipt or acknowledgment is in these words: "Whereas I have purchased from William Richards about 100 acres, which was intended for my sister Elizabeth Hays, therefore I do this day acknowledge the receipt of $100 from my father Robert Quay, to be paid to said Richards on account of said land." Had the plaintiffs rested their case after giving in evidence this paper, it is too plain for argument that they would have made out no title. That Joseph F. Quay intended when he bought the land to give it to his sister Elizabeth, would have raised no trust for her, and that he had received from his father, Robert Quay, $100 to pay on account of his purchase, without further explanation, would not help the matter. The learned counsel for the plaintiffs saw this, and therefore went on to give other evidence. They produced an instrument executed by Joseph F. Quay, dated January 4th 1845, which was indeed a declaration of trust, reciting that "Whereas Robert Quay, in his lifetime, had placed in my hands obligations against Samuel Graham for $300, and directed me to lay out the same in the purchase of land from William Richards for the use of my sister Elizabeth Hays," and proceeding to promise a conveyance to a trustee for her separate use of 50 acres, describing them. The plaintiffs then produced Gilbert Hays, the surviving husband of Elizabeth Hays, who testified that the defendant made no claim to any part of the land until after his father's death; and also Mary Snyder, who testified that the defendant had told him that "he had bought 100 acres of Bill Richards, and that he had to give his sister $600 or half of it." After some other evidence, not material to the points now in dispute, they closed. Now if this parol testimony meant anything it was an attempt to disprove the recital contained in the declaration of January 4th 1845, which they had themselves given in evidence, and to explain the receipt of June 8th 1835, which, without all this, would have been of no avail to them. It was surely then competent for the defendant to rebut it not merely by his own testimony as to the facts, and that the receipt of June 8th 1835, in stating that the

whole land was intended for his sister, was a mistake, and to corroborate that by the deposition of John Quay—that he had heard "much family conversation about the purchase from (his) my father, brother Joseph and sister Elizabeth Hays, and from those conversations I always understood that (his) my sister Elizabeth Hays was to have 50 acres only of this purchase from Richards, which was to adjoin the place she lived on," and as to paying for the 50 acres, Robert Quay had an agreement with Samuel Grimes, Jr., to sell him a claim to some land up the river for $300, which was to be applied to paying for the 50 acres for Elizabeth Hays." After a very long lapse of time a witness could scarcely be expected to testify to a conversation or conversations more particularly, and it was open to the plaintiffs to cross-examine him in regard to the same.

Upon this state of the evidence we think that the law was accurately and properly laid down by the learned judge below in his charge to the jury, and that the points of the plaintiffs were in substance truly answered. That this may be done has been more than once held in this court: Patterson *v.* Kountz, 13 P. F. Smith 250, and cases there cited. Certainly upon this evidence there could be no trust for Elizabeth beyond the quantity of land which her father had paid for her, and the burden of proving that it was greater than was admitted in the declaration by the defendant of January 4th 1845 was upon the plaintiffs. The real character and extent of the trust was to be ascertained by the jury, not from the article of agreement with William Richards and the defendant's receipt alone, but from all the evidence in the cause, written and parol, the greater part of which had been admitted without objection to its competency. We are of the opinion, therefore, that none of the assignments of error have been sustained.

Judgment affirmed.